UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| ESTATE OF F.R. Jr. and LORI ROSILES,<br><br>Plaintiffs,<br><br>    v.<br><br>COUNTY OF YUBA, YUBA COUNTY SHERIFF'S OFFICE, TAMARA PECSI, and JAVIER ZEPEDA,<br><br>Defendants. | No. 2:23-cv-00846 WBS CKD<br><br>MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

----oo0oo----

Plaintiffs Estate of F.R. and Lori Rosiles, F.R.'s mother, brought this action against municipal defendants County of Yuba and Yuba County Sheriff's Office, and individual defendants Tamara Pecsi and Javier Zepeda ("defendant officers"), alleging (1) deprivation of substantive due process under a theory of state-created danger; (2) deprivation of substantive due process under a theory of special relationship; (3) unreasonable post-seizure care in violation of the Fourth Amendment; (4) interference with familial association under the

1

First Amendment; (5) interference with familial association under the Fourteenth Amendment; (6) violation of the Tom Bane Act; (7) intentional infliction of emotional distress; (8) negligence; and (9) wrongful death.  (First. Am. Compl. ("FAC") (Docket No. 20).)  Defendants have moved for summary judgment on all claims.  (Docket No. 24.)

I. Factual and Procedural Background

On February 5, 2023, at around 7:41 p.m., a car drove past a residence in Olivehurst, California and the driver shot at the house several times.  (See Defs.' Statement of Undisputed Facts (Docket No. 24-2) ¶¶ 1-4.)  F.R. was inside the residence, which belonged to a relative, and was shot in the abdomen.  (See id. ¶¶ 2-5, 24.)  Several family members attempted to call 911, and F.R.'s brother eventually got through to the operator.  (Id. ¶ 7.)  At the same time, F.R.'s family members placed F.R. into a truck belonging to F.R.'s uncle in order to transport F.R. to the hospital.  (J.R. Dep. at 13:1-16:16; A.L. Dep. at 16:21-24, 22:22-23.)[1]

The defendant officers -- Sergeant Pecsi and Deputy Zepeda of the Yuba County Sheriff's Office -- learned of the shooting via radio and drove to the scene in their patrol cars.  (Pecsi Dep. at 12:24-13:14; Zepeda Dep. at 7:18-25.)  Pecsi and Zepeda were not wearing body cameras at the time because they were off duty and driving home when they learned of the shooting.  (Pecsi Dep. at 20:18-21:2; Zepeda Dep. at 7:11-20.)

---

[1] The parties lodged with the court the full transcripts of the depositions as well as body camera videos which are referenced in this Order.

2

|   |   |
|---|---|
| 1 | After the truck transporting F.R. had driven a short |
| 2 | distance, one of the defendant officers' patrol cars "blocked" |
| 3 | the truck from leaving.  (See J.R. Dep. at 15:27-17:4; A.L. Dep. |
| 4 | at 24:5-23, 28:2-10.)  F.R. was removed from the vehicle and |
| 5 | placed on the ground.  (See J.R. Dep. at 17:6-26, 18:7-19:13; |
| 6 | A.L. Dep. at 30:12-31:16, 33:6-16.) |
| 7 | A short time later, Deputy Young arrived at the scene, |
| 8 | followed shortly thereafter by Deputy Johannes.  (See Zepeda Dep. |
| 9 | at 28:14-21; Young Decl. (Docket No. 24-3 at 127-29) ¶ 4.) |
| 10 | Deputies Young and Johannes, who are not parties to this action, |
| 11 | were on duty and wearing body cameras.  (See Pecsi Dep. at 40:1- |
| 12 | 13.)  The timestamped body camera footage shows the defendant |
| 13 | officers, along with other officers and medical personnel, |
| 14 | providing medical aid to F.R.  (See Young Body Camera |
| 15 | (YUBA101_LL0101); Johannes Body Camera (YUBA141_LL0141); Spiers |
| 16 | Body Camera (YUBA120_LL0120).)  During this time, F.R. remained |
| 17 | lying on the ground in the midst of a crowd of people, which |
| 18 | included several screaming family members.  (See id.)  Paramedics |
| 19 | then moved F.R. to the ambulance and took him to the hospital. |
| 20 | (Johannes Body Camera at 19:54:22-20:01:10.)  F.R. was declared |
| 21 | dead at 8:17 p.m.  (Docket No. 26-1 at 95.) |

II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law," and a genuine issue is one that could permit a reasonable trier of fact to enter a verdict

3

in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Any inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

III. Federal Claims

    A.    Interference With Familial Association (Fourth and Fifth Claims)

The right to familial association "is entirely judge-made; it does not appear in the text of the Constitution itself." Keates v. Koile, 883 F.3d 1228, 1235 (9th Cir. 2018).  The Ninth Circuit has explained that "[t]he constitutional right to familial association derives from the First and Fourteenth Amendments."  Murguia v. Langdon, 61 F.4th 1096, 1118 (9th Cir. 2023), cert. denied sub nom. Tulare v. Murguia, 144 S. Ct. 553 (2024).  However, the Ninth Circuit "analyze[s] the right of intimate association in the same manner regardless [of] whether [the court] characterize[s] it under the First or Fourteenth Amendments."  Mann v. City of Sacramento, 748 F. App'x 112, 115 (9th Cir. 2018); see also Scanlon v. County of Los Angeles, 92 F.4th 781, 797–98 (9th Cir. 2024) (indicating that there is a single standard for a familial association claim premised on removal of child from parent, regardless of whether it is framed as a violation of the First or Fourteenth Amendment).

"The standard for analyzing a § 1983 claim for interference with the right to familial association depends on the context in which the case arises."  Murguia, 61 F.4th at 1118.  In the context of a familial association claim premised on

4

police conduct, "a plaintiff must establish that an officer's conduct 'shocks the conscience.'" Scott v. Smith, 109 F.4th 1215, 1228 (9th Cir. 2024); see also Garcia through AG v. County of Napa, No. 23-15056, 2024 WL 1734125, at *1 (9th Cir. Apr. 23, 2024) ("Official conduct must 'shock the conscience' to create a First and Fourteenth Amendment claim for loss of familial association.") (citing Porter v. Osborn, 546 F.3d 1131, 1142 (9th Cir. 2008)).[2]

In determining whether police conduct shocks the conscience, "the court must first ask whether the circumstances are such that actual deliberation by the officer is practical." Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010) (cleaned up). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." Id. "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." Id.

Deliberate indifference requires that a state actor "recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff. In other words, the defendant knows that something is going to happen but ignores the risk and exposes [the plaintiff] to it." Patel v. Kent School Dist., 648 F.3d, 965 974 (9th Cir. 2011) (cleaned up). Deliberate indifference exists where

---

[2] It is undisputed that Lori Rosiles, as F.R.'s mother, has standing to bring a familial association claim. See Keates, 883 F.3d at 1237.

"extended opportunities to do better are teamed with protracted failure even to care." Porter, 546 F.3d at 1139 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 853 (1998)).

The court need not decide whether the "deliberate indifference" or "purpose to harm" standard applies here. Even under the lower deliberate indifference standard, the evidence establishes that the conduct of the defendant officers does not shock the conscience.

In the Ninth Circuit case Sinclair v. City of Seattle, the mother of the decedent brought a substantive due process claim[3] against the fire and police officials who responded after the decedent had been shot by a third party at a protest. 61 F.4th 674, 676 (9th Cir.), cert. denied, 144 S. Ct. 88 (2023). The fire department "had an ambulance staged just a block and a half from [the decedent's] location. A man implored the paramedics to help [the decedent], but the medics were apparently waiting for a green light from [the police department]; meanwhile, [the police department] was confused about the paramedics' location. The miscommunication caused a response delay of around 20 minutes before first responders finally arrived to treat [the decedent]." Id. at 677. The Ninth Circuit affirmed the district court's holding that these allegations did not show deliberate indifference. Id. at 681. The court reasoned that while the response was delayed, "medics tried to provide [the decedent] care" and "the City did not prohibit them

---

[3] Substantive due process claims are also evaluated under the "shocks the conscience" standard. See Lewis, 523 U.S. at 846–47.

6

1  from doing so." Id. Further, "[h]ad the City been deliberately
2  indifferent to [the decedent's] particular plight, they would
3  have ignored [the bystanders'] pleas for help altogether. They
4  did no such thing." Id.

5  The facts of the Third Circuit case Vargas v. City of
6  Philadelphia, 783 F.3d 962 (3d Cir. 2015), are eerily similar to
7  the instant case. There, officers responded to a 911 call and
8  encountered a "tense and chaotic scene" with a group of screaming
9  people surrounding an unconscious child experiencing a medical
10 emergency. Id. at 974. The officers prevented the child's
11 mother from transporting the child to the hospital, including by
12 "us[ing] their police cruiser to block [a cousin's] car from
13 leaving for the hospital." Id. at 970, 974. Because the
14 officers knew "an ambulance was about to arrive, they had
15 everyone wait for the paramedics." Id. at 974. The Third
16 Circuit concluded that the plaintiff could not maintain a
17 substantive due process claim because the officers "assisted in a
18 form of rescue -- facilitating an ambulance pick-up -- rather
19 than arresting or abandoning the person in need of aid," and it
20 "is a stretch to say that these facts rise even to the level of
21 negligence, let alone to deliberate indifference or an intent to
22 harm." Id.

23 Similarly to the officers in Sinclair and Vargas, the
24 officers here facilitated the provision of medical aid to F.R.
25 Although the officers prevented F.R.'s family from either
26 transporting him to the hospital or approaching him to provide
27 aid, it is undisputed that the defendant officers knew the
28 emergency dispatcher had already called for both the fire

7

department and paramedics to respond to the scene.  (See J.R. Dep. at 15:27-17:4; A.L. Dep. at 24:5-23, 28:2-10, 34:19-22; Pecsi Dep. at 25:25-27:23; Zepeda Dep. at 24:22-25:12; Linda Fire EMS Report (Docket No. 24-2 at 92-97) at 1; Bi-County Ambulance Report (Docket No. 24-2 at 99-106) at 1.)  It is also undisputed that after arriving on the scene, Pecsi contacted dispatch to request that paramedics enter immediately upon arrival.  (See Pecsi Dep. at 26:11-27:16, 38:18-19; Dispatch Call Info. (Docket No. 24-3 at 108-119) at 1.)

There is no evidence tending to show that the defendants "recognize[d] an unreasonable risk" that waiting for the ambulance would lead to F.R.'s death and "actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff."  See Patel, 648 F.3d at 974. Because the defendant officers knew paramedics were already en route, it was not unreasonable to wait for the ambulance to arrive rather than allow unknown people to transport F.R. in a private vehicle.  See Vargas, 783 F.3d at 974.  And there is no indication that allowing F.R.'s family members, several of whom were children and none of whom appear to have had any medical training, to either transport F.R. to the hospital in a private vehicle or approach F.R. would have prevented F.R.'s death.

Although F.R.'s siblings testified that the defendant officers provided no medical aid (see J.R. Dep. at 19:26-20:4; A.L. Dep. at 34:4-35:4), their testimony is directly contradicted by the available body camera videos.  The footage shows that when Deputy Young arrived, both defendants were kneeling beside F.R.'s body and Pecsi was pressing her hands over the bullet wound.

8

(See Young Body Camera at 19:51:50-19:52:27.)  As Deputy Young unpacked his medical bag, Pecsi continued to apply pressure to the wound while Zepeda talked to F.R. and tried to keep him conscious.  (See Young Body Camera at 19:52:28-19:53:02; Zepeda Dep. at 27:6-19.)  Zepeda then used Deputy Young's medical shears to cut off F.R.'s shirt to assist with treating the gunshot wound.  (See Young Body Camera at 19:52:48-55; Zepeda Dep. at 26:11-17.)  Shortly thereafter, Deputy Johannes, the firefighters, and the paramedics arrived and further aid was provided, including the placement of a seal over the wound and administration of oxygen.  (See Johannes Body Camera at 19:53:20-19:56:40; Zepeda Dep. at 28:22-29:16.)  F.R. was then moved to the ambulance and taken to the hospital.  (See Johannes Body Camera at 19:56:41-20:01:28.)

Based on the video footage, it is undisputed that the defendant officers provided medical aid prior to the intervention of paramedics and did not interfere with F.R. being transported to the hospital in the ambulance.  See Scott v. Harris, 550 U.S. 372, 380 (2007) (where the non-moving party's version of events is "blatantly contradicted" by unchallenged video evidence, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

Construing the conflicting video footage and deposition testimony in plaintiffs' favor, it is theoretically possible that the defendant officers provided no medical aid prior to the arrival of Deputy Young but began providing care upon his arrival.  However, the footage shows that by the time Deputy Young arrived, the defendant officers were already kneeling next

9

1  to F.R., F.R.'s shirt had been pulled up to give the officers
2  access to the gunshot wound, and Pecsi was holding her hands over
3  the wound.  (See Young Body Camera at 19:51:50-19:52:21.)  A
4  version of events in which the defendant officers did nothing to
5  aid F.R. for several minutes,[4] then suddenly jumped into place
6  around F.R.'s body to appear helpful when Deputy Young arrived,
7  strains credulity and is unsupported by any affirmative evidence.
8  See Matsushita, 475 U.S. at 586 ("When the moving party has
9  carried its burden under Rule 56(c), its opponent must do more
10 than simply show that there is some metaphysical doubt as to the
11 material facts.").

12        Regardless, the fact remains that the defendant
13 officers did provide medical aid rather than "ignor[ing] . . .
14 pleas for help altogether," Sinclair, 61 F.4th at 676, or
15 "abandoning the person in need of aid," Vargas, 783 F.3d at 974.
16 Under the circumstances here, any purported delay in providing
17 medical aid during the short period of time between the defendant
18 officers' arrival and the arrival of Deputy Young is insufficient
19 to establish a genuine dispute of material fact as to deliberate
20 indifference.  Cf. Lemire v. California Dep't of Corr. & Rehab.,
21 726 F.3d 1062, 1077-78 (9th Cir. 2013) (finding genuine dispute
22 of material fact as to deliberate indifference where prison
23 officials were trained in CPR and had CPR masks in their
24 possession but failed to administer CPR or provide any care prior

---

[4] The parties dispute the length of time that elapsed between the arrival of the defendant officers and the arrival of Deputy Young.  However, it is undisputed that it was a matter of minutes.  F.R. was shot at around 7:41 and Deputy Young arrived at 7:51. (See Young Body Camera at 19:51:50.)

10

1  to arrival of medical staff).

2       The evidence before the court does not show a
3  "protracted failure even to care," see Porter, 546 F.3d at 1139,
4  but rather establishes that the officers tried to aid F.R. and
5  were not deliberately indifferent.  As the Supreme Court has
6  explained, "only the most egregious official conduct" can be
7  considered "conscience shocking, in a constitutional sense."  See
8  Lewis, 523 U.S. at 846.  Accordingly, summary judgment in
9  defendants' favor will be granted on the familial association
10 claims.

11      B.   State-Created Danger (First Claim)

12      Under the state-created danger rule, state actors may
13 be held liable under the Fourteenth Amendment for a deprivation
14 of substantive due process where (1) "[t]he officer's affirmative
15 conduct' [exposed] the plaintiff to a foreseeable danger that she
16 would not otherwise have faced," and (2) the officer acted "with
17 'deliberate indifference' to a 'known or obvious danger.'"
18 Martinez v. High, 91 F.4th 1022, 1028 (9th Cir.), cert. denied,
19 145 S. Ct. 547 (2024); see also Murguia, 61 F.4th at 1111.

20      Plaintiffs contend that the defendant officers placed
21 F.R. in danger when they prevented him from being transported to
22 the hospital in a family member's private vehicle.  (See J.R.
23 Dep. at 13:1-17:26; A.L. Dep. at 16:21-24, 22:22-23, 24:23,
24 30:12-31:16, 33:6-16).

25      In Maxwell v. County of San Diego, the defendant
26 officers prevented an ambulance from transporting the plaintiff,
27 who had suffered a gunshot wound, to the hospital.  708 F.3d
28 1075, 1080-81 (9th Cir. 2013).  The Ninth Circuit held that the

state-created danger exception applied because the officers found the plaintiff "facing a preexisting danger from [a] gunshot wound" and "[i]mped[ed] access to medical care," which "amounts to leaving [the plaintiff] in a more dangerous situation." Id. at 1082.

The defendant officers similarly found F.R. facing a preexisting gunshot wound. But unlike in Maxwell, the defendant officers prevented a private vehicle, not an ambulance, from transporting F.R.; they were aware an ambulance was on the way and provided medical assistance to F.R. before paramedics arrived; and they did not interfere with F.R.'s transportation to the hospital via ambulance. (See J.R. Dep. at 15:27-17:4; A.L. Dep. at 24:5-23, 28:2-10; Pecsi Dep. at 25:25-27:23; Zepeda Dep. at 24:22-25:12; Young Body Camera at 19:52:14-19:53:18; Johannes Body Camera at 19:54:22-19:57:22.)

Under these circumstances, it was not "foreseeable 'as a matter of common sense'" that refusing to allow F.R.'s family to transport him to the hospital would increase the danger faced by F.R.[5]  See Murguia, 61 F.4th at 1116 (quoting Martinez v. City

---

[5] In the context of ruling on defendants' motion to dismiss the state-created danger claim, based strictly on the allegations of the complaint, the court came to a different conclusion. (Docket No. 15.) At that time, the court reasoned that the allegations of the complaint were sufficiently analogous to the facts of Maxwell to state a claim. See Est. of F.R. v. County of Yuba, No. 2:23-cv-00846 WBS CKD, 2023 WL 6130049, at *2 (E.D. Cal. Sept. 19, 2023). However, the allegations made at the pleadings stage are substantially different from the facts that presumably emerged during discovery and are now before this court. The operative complaint paints a picture of officers who detained F.R.'s family at gunpoint, prioritized investigating the shooting over saving F.R., and did nothing to aid F.R. while preventing F.R.'s family from intervening, thereby causing his death. (See FAC ¶¶ 22-32, 45.)  The record before the court

of Clovis, 943 F.3d 1260, 1274 (9th Cir. 2019)).  To the contrary, waiting for the ambulance led to F.R. receiving medical attention within minutes.  And there is no evidence before the court indicating that F.R. would have received medical care more quickly had his family members transported him to the hospital, which was located approximately 2.2 miles away.  (See Docket No. 26-1 at 69-70.)  Cf. Maxwell, 708 F.3d at 1082 (state-created danger exception applied where the plaintiff faced a preexisting danger due to a gunshot wound and there was "evidence [the defendants] affirmatively increased that danger by preventing her ambulance from leaving") (emphasis added).

For the foregoing reasons, the state-created danger exception does not apply.[6]  See id. at 1080-82; Vargas, 783 F.3d at 973-74 (no state-created danger claim where officers prevented mother from transporting her daughter to the hospital and waited for paramedics to arrive, and daughter subsequently died of an underlying medical condition not caused by the officers).  See also Waldron v. Spicher, 954 F.3d 1297, 1306 (11th Cir. 2020) ("an unsuccessful, negligent, or reckless . . . interference with a bystander's rescue attempt" does not constitute a substantive due process violation) (quoting Hamilton v. Cannon, 80 F.3d 1525,

---

provides no support for those allegations, but rather demonstrates that the officers knew emergency medical assistance was en route and themselves provided medical aid.  Based on the evidence before it, the court can no longer conclude that this case is analogous to Maxwell.

[6]   Even if the officers' conduct exposed F.R. to a foreseeable danger, the state-created danger claim would still fail because, as discussed above, the evidence is insufficient to support a finding that defendant officers were deliberately indifferent.  See Martinez, 91 F.4th at 1028.

1532 (11th Cir. 1996)). Accordingly, summary judgment in defendants' favor will be granted on the state-created danger claim.

C.  Special Relationship (Second Claim)

"The Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." Patel, 648 F.3d at 971. However, under the "special relationship" exception, state actors may be held liable for their omissions where they "'take[] a person into [their] custody and hold[] him there against his will.'" Id. at 971-72 (quoting Deshaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989)). This exception exists because "a state cannot restrain a person's liberty without also assuming some responsibility for the person's safety and well-being." Id. at 972.

A claim premised on the special relationship exception is a variety of substantive due process claim. See id. Even if F.R. was in custody such that a special relationship existed, this claim fails because there is no underlying substantive due process violation. A substantive due process violation exists where the officers' conduct "shocks the conscience." See Lewis, 523 U.S. at 846-47. As discussed above, the evidence establishes that the officers' conduct did not shock the conscience. Accordingly, summary judgment in defendants' favor will be granted on the special relationship claim.

D.  Unreasonable Post-Seizure Care (Third Claim)

Under the Fourth Amendment, "[o]fficers must provide

14

objectively reasonable post-arrest care" to an individual in police custody. Rosales v. County of San Diego, 511 F. Supp. 3d 1070, 1091 (S.D. Cal. 2021) (citing Tatum v. City & County of San Francisco, 441 F.3d 1090, 1098 (9th Cir. 2006)). "The Ninth Circuit has not precisely defined the contours of what it means to provide 'objectively reasonable post-arrest care.'" Henriquez v. City of Bell, 14-cv-196 GW SS, 2015 WL 13357606, at *6 (C.D. Cal. Apr. 16, 2015). "However, the Fourth Amendment analysis generally concerns whether the defendant's conduct was reasonable under the totality of the circumstances, viewed from the perspective of a reasonable person on the scene." Rosales, 511 F. Supp. 3d at 1091 (citing Plumhoff v. Rickard, 572 U.S. 765, 774-75 (2014); Tatum, 441 F.3d at 1098).

The Tatum case is instructive. There, the Ninth Circuit concluded that the arresting officers had provided objectively reasonable post-arrest care where they "promptly summon[ed] the necessary medical assistance" and monitored the plaintiff's medical condition. 441 F.3d at 1093, 1099. The court held that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer" a particular type of care. See id. at 1099.

Here, the defendant officers were aware that medical assistance was already on the way, and Pecsi contacted dispatch to request that the paramedics enter the scene immediately upon arrival. (See Pecsi Dep. at 25:25-27:23; Zepeda Dep. at 24:22-25:12.) Even if the officers did not provide medical aid prior to the arrival of Deputy Young, the Fourth Amendment does not

"require an officer to provide what hindsight reveals to be the most effective medical care" for an arrestee. Tatum, 441 F.3d at 1098. Medical assistance had already been summoned by the time F.R. was allegedly seized, and the Fourth Amendment required no more. See id. at 1099.[7] See also Cato v. County of San Bernardino, No. 5:20-cv-02602, 2023 WL 5505012, at *12 (C.D. Cal. July 3, 2023) (granting summary judgment in favor of officers on Fourth Amendment post-seizure care claim where it was not clear who called for medical aid, but it was undisputed that "medical staff had already been summoned"); Lawrence v. Las Vegas Metro. Police Dep't, 451 F. Supp. 3d 1154, 1171 (D. Nev. 2020) (granting summary judgment on Fourth Amendment post-seizure care claim in favor of all three officers who responded to a shooting where only one of them summoned medical assistance). Accordingly, summary judgment in defendants' favor will be granted on the post-seizure care claim.

    E.   Qualified Immunity

Even if plaintiffs had established genuine disputes of material fact precluding summary judgment on the constitutional claims, the defendant officers would still be entitled to qualified immunity because they did not violate clearly established law. See Pearson v. Callahan, 555 U.S. 223, 232 (2009) ("Qualified immunity is applicable unless the official's

---

[7] This court previously reasoned that the instant case was factually distinguishable from Tatum and plaintiffs had stated a claim for unreasonable post-seizure care because, inter alia, "it is not clear from the complaint that the officers involved did call for assistance at all." See Est. of F.R., 2023 WL 6130049, at *3. The court reaches a different result here because the evidence in the record is to the contrary.

conduct violated a clearly established constitutional right."). Based on the authorities discussed above, a reasonable officer in defendants' position would not understand that his conduct violated plaintiffs' constitutional rights. See Saucier v. Katz, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

IV. State Claims

Because the court grants summary judgment on plaintiffs' federal claims, it no longer has federal question jurisdiction. A district court "may decline to exercise supplemental jurisdiction" over state law claims subject to that jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." See 28 U.S.C. § 1367(c)(3); see also Acri v. Varian Assocs., Inc., 114 F.3d 999, 1001 n.3 (9th Cir. 1997) (en banc) (district courts may sua sponte decline to exercise supplemental jurisdiction).

Here, as in "the usual case in which all federal-law claims are eliminated before trial," the "balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness and comity -- [points] toward declining to exercise jurisdiction over the remaining state-law claims." See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Accordingly, the court declines to exercise supplemental jurisdiction and will dismiss plaintiffs' remaining state law claims, but passes no judgment on the merits of those claims.

1          IT IS THEREFORE ORDERED that defendants' motion for
2     summary judgment (Docket No. 24) be, and the same hereby is,
3     GRANTED as to the federal claims.  The state claims are DISMISSED
4     WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c).  The Clerk of
5     Court is directed to close the case.
6     Dated:  May 29, 2025

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE